UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN RYERSE, *et al.*,

        Plaintiffs,

Case No. 1:08-cv-516

Hon. Robert J. Jonker

v.

PATRICIA CARUSO, *et al.*,

        Defendants.

_____/

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner and his mother pursuant to 42 U.S.C. § 1983. This matter is now before the court on defendants' motion to dismiss (docket no. 13).

**I.    Background**

Plaintiffs seek relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

The plaintiffs in this action are Jeremy Allen Maddox, Sr. ("Maddox"), a prisoner in the custody of the Michigan Department of Corrections ("MDOC"), and his mother, Susan Ryerse, who appears "on behalf of herself" and Maddox's three children, J.M. Jr., D.M. and C.M.

Three defendants have appeared in this action: MDOC Director Patricia Caruso; MDOC Deputy Director Dennis Straub; and Office of Legal Affairs Administrator Richard Stapleton.[1]

Plaintiffs set forth the following allegations. On April 5, 2004, Maddox was convicted of smuggling contraband into the prison. He received an additional sentence of 18 to 120 months in prison. In addition, the MDOC restricted all of his visits pending a review after three years, pursuant to MDOC Policy Directive 05.03.140 "Prisoner Visiting." *See* docket no. 1-2. Plaintiff re-applied for reinstatement of visiting privileges after three years, but his request was denied.

Plaintiff was transferred to the Newberry Correctional Facility ("NCF") and upon the expiration of a 12-month period, reapplied for reinstatement of his visiting privileges. See docket no. 1-4. NCF Warden Davis agreed with the reinstatement. *See* docket no. 1-3. However, the request was denied because his visiting restrictions were now "permanent and unreviewable." Attached to plaintiff's complaint is a memorandum dated April 16, 2008 from Jerry Carnes, an administrative assistant at NCF, which sets forth the issues at the heart of the parties' dispute:

> As you are aware, your visiting privileges were removed in 2004 by Director Caruso, due to an attempt by you and a friend to smuggle marijuana during a visit. You were prosecuted for that and received an additional sentence as a result. In that same year, Warden M. Warren (TCF) [Thumb Correctional Facility] authorized you to receive non-contact visits with immediate family members; you have subsequently had several of these visits, including some here at NCF.
>
> You requested that your visits be reinstated a year ago; a memo from Deputy Director Straub recommended against this, and Director Caruso concurred with her signature, also noting [sic] that you could "reapply in 12 months." You again requested in the recent past, and later asked me about its status. I told you at that time that the warden was inclined to recommend that your visits be reinstated, due

---

[1] Plaintiffs have failed to identify the following additional defendants: "Unknown Party" named as "The Executive Policy Team;" and, "Unknown Parties" named as "Employees of the Office of Legal Affairs and the Operations Support Administration, and Others Unknown."

2

to your good behavior both before and since that initial incident, but that the Director would have the final say.

Unfortunately, it has been discovered that errors have been made which are in conflict with the policy. When this occurred, I sought and received clarification from Lansing, to make sure.

The first discovery was that although policy allows for reinstatement of visits for certain circumstances, it does not in your case. Paragraph BBB of PD 05.03.140 [effective Oct. 1, 2007] gives the conditions under which the Director may remove the restriction; however, #1 states that "The restriction shall not be removed if it is based on a felony that occurred during a visit." It has been clarified by Lansing that policy does not allow for your visits to be reinstated. It also requires that if you request this, the warden is to inform you of your ineligibility; i.e., he does not forward your request to Lansing for a determination by the Director.

It was also found that policy does not allow for a Warden to grant non-contact visits when a prisoner's visiting privileges have been removed. I'm guessing that paragraph EE may have been misinterpreted; it says that "the Warden may limit a prisoner of any security level to non-contact visits . . . 1) when visiting an immediate family member . . . who is subject to a visitor restriction." As Lansing has stated, this applies only to an individual immediate family member whose visits have been denied. In your case, it was not any of your individual family members whose visits were denied, but all of yours, and this paragraph does not apply.

You will therefore be allowed no more visits - either contact or non-contact - and per policy, you also cannot be considered by the Director for reinstatement of visits.

The last of these clarification memos came from Lansing yesterday (April 15th); coincidentally, your mother called this morning asking about the status of your request. I let her know what has transpired, and as I said to her, I apologize if this has caused any inconvenience, although you did have many visits that otherwise would not have been allowed if this mistake had never occurred.

Feel free to contact me with any questions and/or concerns.

Docket no. 1-4.

Plaintiffs contend that the policy directive, as amended on October 1, 2007, is unconstitutional, violating the First Amendment, the double jeopardy clause of the Fifth Amendment, the Eighth Amendment, and the due process clause of the Fourteenth Amendment.

3

Plaintiffs have sued defendants in both their official and individual capacities. Plaintiffs seek money damages and an injunction to restrain defendants from enforcing PD 05.03.140, ¶ BBB.

## II. The Court's deficiency order regarding plaintiff Susan Ryerse

In a deficiency order entered June 16, 2008, the court noted that plaintiff Susan Ryerse was not qualified to represent Maddox's children, the minor plaintiffs in this action. *See* docket no. 2. At that time, the court noted that "Susan Ryerse may not represent her grandchildren in this action." *Id.* Ryerse has taken no steps to qualify as the minors' representative in this matter. Accordingly, the minor children, J.M. Jr., D.M. and C.M. should be stricken as plaintiffs in this action.

## III. Legal Standard

Defendants seek to dismiss plaintiffs' action for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted). In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Churchs Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the

4

Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).

### IV. Discussion

#### A. Constitutional challenge to the MDOC's visitation policy

Defendants contend that PD 05.03.140, ¶ BBB is constitutionally valid. They rely on the Supreme Court's opinion in *Overton v. Bazzetta*, 539 U.S. 126 (2003). In *Overton*, the Supreme Court rejected the plaintiffs' claims that certain visitation restrictions set forth in a previous version of this policy directive violated their rights under the First, Eighth and Fourteenth Amendments. Overton, 539 U.S. at 128-37. Given that defendants' position is based upon the *Overton* opinion, the court will review the pertinent parts of that opinion in detail.

In *Overton*, the Supreme Court summarized the history of the MDOC's visitation restrictions as follows:

> The population of Michigan's prisons increased in the early 1990's. More inmates brought more visitors, straining the resources available for prison supervision and control. In particular, prison officials found it more difficult to maintain order during visitation and to prevent smuggling or trafficking in drugs. Special problems were encountered with the increase in visits by children, who are at risk of seeing or hearing harmful conduct during visits and must be supervised with special care in prison visitation facilities.
>
> The incidence of substance abuse in the State's prisons also increased in this period. Drug and alcohol abuse by prisoners is unlawful and a direct threat to legitimate objectives of the corrections system, including rehabilitation, the maintenance of basic order, and the prevention of violence in the prisons.
>
> In response to these concerns, the Michigan Department of Corrections (MDOC or Department) revised its prison visitation policies in 1995, promulgating the regulations here at issue. One aspect of the Department's approach was to limit the visitors a prisoner is eligible to receive, in order to decrease the total number of visitors.

5

> Under MDOC's regulations, an inmate may receive visits only from individuals placed on an approved visitor list, except that qualified members of the clergy and attorneys on official business may visit without being listed. Mich. Admin. Code Rule 791.6609(2) (1999); Director's Office Mem.1995-59 (effective date Aug. 25, 1995). . . .
>
> The Department's revised policy also sought to control the widespread use of drugs and alcohol among prisoners. Prisoners who commit multiple substance-abuse violations are not permitted to receive any visitors except attorneys and members of the clergy. Rule 791.6609(11)(d). An inmate subject to this restriction may apply for reinstatement of visitation privileges after two years. Rule 791.6609(12). Reinstatement is within the warden's discretion. *Ibid.*

*Overton*, 539 U.S. 126, 129-30.

The Supreme Court determined that the MDOC could restrict visitation, because there was a rational relation between the regulations restricting visitiation and legitimate penological interests under *Turner v. Safley*, 482 U.S. 78 (1987). *Id.* at 131-32. "In *Turner* we held that four factors are relevant in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands constitutional challenge: whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation." *Id.* at 132.

In applying the first *Turner* factor, the court found that the visitation restriction served a legitimate governmental purpose:

> [T]he restriction on visitation for inmates with two substance-abuse violations, a bar which may be removed after two years, serves the legitimate goal of deterring the use of drugs and alcohol within the prisons. Drug smuggling and drug use in prison are intractable problems. Withdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high-security prisoners who have few other privileges to

lose. In this regard we note that numerous other States have implemented similar restrictions on visitation privileges to control and deter substance-abuse violations.

Respondents argue that the regulation bears no rational connection to preventing substance abuse because it has been invoked in certain instances where the infractions were, in respondents' view, minor. Even if we were inclined, though, to substitute our judgment for the conclusions of prison officials concerning the infractions reached by the regulations, the individual cases respondents cite are not sufficient to strike down the regulations as to all noncontact visits. Respondents also contest the 2-year bar and note that reinstatement of visitation is not automatic even at the end of two years. We agree the restriction is severe. **And if faced with evidence that MDOC's regulation is treated as a de facto permanent ban on all visitation for certain inmates, we might reach a different conclusion in a challenge to a particular application of the regulation. Those issues are not presented in this case, which challenges the validity of the restriction on noncontact visits in all instances.**

*Id.* at 134 (citations omitted) (emphasis added).

In reviewing the second *Turner* factor, the court found that the prisoners had an alternative means to exercise the asserted right:

Having determined that each of the challenged regulations bears a rational relationship to a legitimate penological interest, we consider whether inmates have alternative means of exercising the constitutional right they seek to assert. Were it shown that no alternative means of communication existed, though it would not be conclusive, it would be some evidence that the regulations were unreasonable. That showing, however, cannot be made. Respondents here do have alternative means of associating with those prohibited from visiting. As was the case in *Pell*, inmates can communicate with those who may not visit by sending messages through those who are allowed to visit. Although this option is not available to inmates barred all visitation after two violations, they and other inmates may communicate with persons outside the prison by letter and telephone. Respondents protest that letter writing is inadequate for illiterate inmates and for communications with young children. They say, too, that phone calls are brief and expensive, so that these alternatives are not sufficient. Alternatives to visitation need not be ideal, however; they need only be available. Here, the alternatives are of sufficient utility that they give some support to the regulations, particularly in a context where visitation is limited, not completely withdrawn.

*Id.* at 135.

7

The Supreme Court also found that the visitation regulation met the third *Turner* factor:

> Another relevant consideration is the impact that accommodation of the asserted associational right would have on guards, other inmates, the allocation of prison resources, and the safety of visitors. Accommodating respondents' demands would cause a significant reallocation of the prison system's financial resources and would impair the ability of corrections officers to protect all who are inside a prison's walls. When such consequences are present, we are "particularly deferential" to prison administrators' regulatory judgments.

*Id.* at 135.

With respect to the fourth *Turner* factor, i.e., the presence of ready alternatives, the court found as follows:

> Finally, we consider whether the presence of ready alternatives undermines the reasonableness of the regulations. *Turner* does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal. Respondents have not suggested alternatives meeting this high standard for any of the regulations at issue. . . Respondents suggest the duration of the restriction for inmates with substance-abuse violations could be shortened or that it could be applied only for the most serious violations, but these alternatives do not go so far toward accommodating the asserted right with so little cost to penological goals that they meet *Turner's* high standard. These considerations cannot justify the decision of the Court of Appeals to invalidate the regulation as to all noncontact visits.

*Id.* at 136 (citations omitted).

The court then addressed the plaintiffs' claim that the visitation restrictions imposed on inmates with two substance-abuse violations was contrary to the Eighth Amendment (a claim similar to the one raised in this case):

> Respondents also claim that the restriction on visitation for inmates with two substance-abuse violations is a cruel and unusual condition of confinement in violation of the Eighth Amendment. The restriction undoubtedly makes the prisoner's confinement more difficult to bear. But it does not, in the circumstances of this case, fall below the standards mandated by the Eighth Amendment. Much of

8

what we have said already about the withdrawal of privileges that incarceration is expected to bring applies here as well. **Michigan, like many other States, uses withdrawal of visitation privileges for a limited period as a regular means of effecting prison discipline.** This is not a dramatic departure from accepted standards for conditions of confinement. Nor does the regulation create inhumane prison conditions, deprive inmates of basic necessities, or fail to protect their health or safety. Nor does it involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur. **If the withdrawal of all visitation privileges were permanent or for a much longer period,** or if it were applied in an arbitrary manner to a particular inmate, the case would present different considerations. An individual claim based on indefinite withdrawal of visitation or denial of procedural safeguards, however, would not support the ruling of the Court of Appeals that the entire regulation is invalid.

*Id.* at 136-37 (citations omitted) (emphasis added).

Defendants contend that the Supreme Court's decision in *Overton* established that the MDOC's visitation restrictions, including the restrictions at issue in this action, are constitutional. The court disagrees. *Overton* addressed constitutional challenges to a regulation that required a two-year waiting period to remove a visitation restriction imposed because the prisoner had "[t]wo or more violations of the major misconduct charge of substance abuse." [2] Here, however, plaintiffs' challenge the constitutionality of a different regulation which imposed a permanent restriction on an inmate found guilty of "[a] felony or misdemeanor that occurred during a visit." PD 05.03.140, ¶ XX.1 (Eff. Oct. 1, 2007). Unlike the visitation restriction at issue in *Overton*, the restriction contested in this case is permanent and unreviewable. *See* PD 05.03.140, ¶ BBB.1 (Eff. Oct. 1, 2007) ("The Director may remove a restriction upon written request of the warden or the restricted prisoner, subject to the following . . . The restriction shall not be removed

---

[2] *See Bazetta v. McGinnis*, 148 F. Supp. 2d 813, 833, 844 (E.D. Mich. 2001), *reversed* in *Overton*, 539 U.S. 126 (discussing applicability of PD 05.03.140 ¶¶ BBB.4, FFF.2 (Eff. Jan. 12, 1998)).

9

if it is based on a felony or misdemeanor that occurred during a visit or if it based on an escape, attempted escape or conspiracy to escape associated with a visit.").[3]

In *Overton*, the Supreme Court did not address such a permanent loss of visitation rights. Indeed, the Supreme Court observed that such a permanent loss of visitation was one factor which could have led to a different result in that case. *Overton*, 539 U.S. at 134, 136-37. Defendants gloss over this distinction, by stating that the policy directive has mandated such a permanent loss of visitation "since at least as far back as January 12, 1998," and that "the ban is not permanent because the plaintiff's earliest release date is 2014." *See* docket no. 14 at pp. 7, 9.[4] These cryptic justifications for the policy do not address the concerns expressed by the Supreme Court, but simply beg the question of what constitutes a "permanent" loss of visitation and whether such a loss would pass the *Turner* test. In addition, defendants state that "plaintiff has alternative means of maintaining relationships with his family *via* telephone and written correspondence." *Id.* This statement raises a factual issue regarding the adequacy of plaintiff's ability to communicate with members of his family that is outside of the scope of the present motion to dismiss. *See Bassett*, 528 F.3d at 430.[5]

---

[3] The court notes that the unreviewable restriction provision for the commission of a felony or misdemeanor during a visit set forth in PD 05.03.140, ¶ BBB.1 (Eff. Oct. 1, 2007) is identical to unreviewable restriction provision set forth in PD 05.03.140, ¶ FFF.1 (Eff. Jan. 12, 1998).

[4] Defendants' have failed to explain how their second justification is relevant to the issue before the court. The MDOC would not be able to impose these visitation restrictions on Maddox after his release from prison.

[5] In his response, Maddox points out that a Director's Office Memorandum ("DOM") 2006-12 (July 1, 2006) allowed the CFA Deputy Director to remove certain permanent restrictions. *See* docket no. 22-2. However, it appears to the court that this DOM applies to restrictions placed on visitors to the prison, not restrictions placed on a prisoner's ability to receive visitors. *See* PD 05.03.140, ¶ OO through ¶ AAA (Eff. Jan. 12, 1998).

For these reasons, it appears to the court that plaintiffs's complaint has raised a legal issue with respect to the constitutionality of the permanent visitation ban set forth in PD 05.03.140 ¶ BBB. Plaintiffs' claim is "plausible on its face." *Iqbal*, 129 S. Ct. at 1949. Defendants' motion to dismiss should be denied with respect to this constitutional challenge.

### B. Eleventh Amendment Immunity

Plaintiffs have sued defendants in both their official and individual capacities. Plaintiff's § 1983 claims for monetary damages against the defendants in their official capacities are barred by Eleventh Amendment immunity. *See Will v. Department of State Police*, 491 U.S. 58, 64-71 (1989); *Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003) ("the Eleventh Amendment bars § 1983 suits seeking money damages against states and against state employees sued in their official capacities"). Accordingly, defendants are entitled to summary judgment on these claims for damages for acts performed in their official capacities.

### C. Qualified Immunity

Finally, defendants assert that they are entitled to qualified immunity with respect to their actions in enforcing this policy directive. Qualified immunity from civil actions for damages is not a mere defense to liability, but rather absolute immunity from suit and an entitlement not to stand trial, which should be determined at the earliest possible stage in litigation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Government officials have qualified immunity from suit under § 1983 for damages arising out of the performance of their official duties if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Consequently, the doctrine of qualified

immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity involves a two-fold inquiry:

> First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . [T]he next, sequential step is to ask whether the right was clearly established."

*Barber v. Overton*, 496 F.3d 449, 453 (6th Cir. 2007), quoting *Saucier*, 533 U.S. at 201. "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Drogosch v. Metcalf*, 557 F.3d 372, 379 (6th Cir. 2009), quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Defendants' two-paragraph discussion of qualified immunity does not address this issue in any detail. The first paragraph consists of boilerplate language regarding the legal standard for qualified immunity. The second paragraph contains a conclusory demand for relief:

> As discussed above, *Overton v. Bazzetti* is clearly established law that holds prison officials can infringe upon prisoner constitutional rights as long as the infringement is reasonably related to legitimate penological objectives. The policy in question is reasonably related to Maddox from committing repeat violations. The policy does not violate any clearly established law, and the defendants are entitled to qualified immunity.

Docket no. 14 at pp. 10-11.

Defendants' assertion of qualified immunity is both inadequate and unpersuasive. While *Overton* upheld a regulation allowing officials to restrict a prisoner's visitation for two years, it cannot be said that *Overton* "clearly established" the constitutionality of the permanent visitation restriction in this case. As this court previously discussed, *Overton* avoided addressing the constitutionality of such a permanent restriction. Other than citing *Overton*, defendants have made no effort to address their qualified immunity from plaintiffs' First, Fifth, Eighth and Fourteenth Amendment claims. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort

12

at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Defendants' request for qualified immunity should be denied.

## V.     Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion to dismiss (docket no. 13) be **GRANTED** as to plaintiffs' claim for damages asserted against defendants in their official capacities, but **DENIED** in all other respects.


Dated:  July 20, 2009                                             /s/ Hugh W. Brenneman, Jr.
                                                                  HUGH W. BRENNEMAN, JR.
                                                                  United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).